961 So.2d 1271 (2007)
STATE of Louisiana
v.
Wardell HERRINGTON.
No. 2007-KA-0070.
Court of Appeal of Louisiana, Fourth Circuit.
June 20, 2007.
*1272 Eddie J. Jordan, Jr., District Attorney, Alyson Graugnard, Assistant District Attorney, New Orleans, LA, for Appellee, State of Louisiana.
Christopher A. Aberle, Louisiana Appellate Project, Mandeville, LA, for Defendant/Appellant, Wardell Herrington.
(Court composed of Judge JAMES F. McKAY, III, Judge DAVID S. GORBATY, Judge LEON A. CANNIZZARO, JR.).
LEON A. CANNIZZARO, JR., Judge.
Wardell Herrington was convicted of being a convicted felon in possession of a firearm in violation of La. R.S. 14:95.1.[1] He is now appealing his conviction.

STATEMENT OF THE CASE
The State of Louisiana filed a bill of information charging Mr. Herrington with one count of being a convicted felon in possession of a firearm. He was arraigned and entered a plea of not guilty. A hearing on a motion to suppress evidence was held, and the motion was denied. At Mr. Herrington's trial, a jury returned a verdict of guilty as charged. Approximately seven months later, the trial court denied Mr. Herrington's motion for a new trial and for post-verdict judgment of acquittal, and Mr. Herrington stated that he was ready to be sentenced.[2] The trial court then sentenced him to ten years at hard labor without the benefit of parole, probation, or suspension of sentence. He was also ordered to pay a fine of $1,000.00, but the trial court suspended the fine. Mr. Herrington moved for an appeal, which was granted.
After the record was lodged in this Court, a motion was filed to supplement the record with the transcript of the hearing on the motion to suppress evidence. In response to the motion to supplement the record, the court reporter for the trial court certified that the transcript of the motion hearing could not be produced, because the tapes and notes of the hearing were lost in the flooding that followed Hurricane Katrina.

STATEMENT OF THE FACTS
At the trial New Orleans Police Department ("NOPD") Detective Chad Perez testified that he was on patrol traveling on Martin Luther King Boulevard in New Orleans on the night that Mr. Herrington was arrested. While he was on patrol, Detective Perez received a call from a police dispatcher stating that two individuals, a man named Wardell, Jr. and a man named Wardell, Sr., were wanted in connection with a shooting and that they were walking in the 3600 block of Thalia Street in the C.W. Cooper Housing Development. This location was near Martin Luther King Boulevard. The dispatcher advised Detective Perez that Wardell, Jr. was wearing a white tee shirt and blue jeans and that *1273 Wardell, Sr. was wearing a yellow tee shirt and blue jeans.
Detective Perez testified that he had previously worked in the area where he was on patrol and was aware of a father and son known as Wardell, Jr. and Wardell, Sr. Detective Perez said that the person known as Wardell, Jr. was named Wardell Herrington and that the person known as Wardell, Sr. was named Wardell Helmstetter.
After he received the call from the dispatcher, Detective Perez drove in the direction of the intersection of South Dorgenois Street and Martin Luther King Boulevard, which was about a block and a half from the 3600 block of Thalia Street. As he was driving in the direction of the intersection, Detective Perez observed a black male wearing a white tee shirt and blue jeans crossing the intersection. As he drove closer, Detective Perez recognized the person as Wardell Herrington.
Because the dispatcher had said that Mr. Herrington was wanted, Detective Perez positioned his police vehicle behind Mr. Herrington, exited the vehicle, and ordered Mr. Herrington to come to the vehicle. Detective Perez testified that Mr. Herrington complied with his request, that he did not try to flee, that he was not engaged in any obvious criminal activity at the time, and that he offered no resistance to Detective Perez. Detective Perez also said that Mr. Herrington was alone, not walking with his father as the dispatcher had indicated.
Because of the nature of the dispatcher's message and because the area where they were was a high crime area, when Mr. Herrington came to the police car, Detective Perez asked him to place his hands on the hood of the police car. To assure his safety, Detective Perez checked for weapons on Mr. Herrington's person. He initially checked Mr. Herrington's waistband, and when he "was running my hand down his right pant leg, a blue steel revolver fell from the bottom of his pant leg . . . toward his outer ankle."
After he saw the firearm, Detective Perez placed Mr. Herrington in handcuffs. Detective Perez then picked up the revolver, which he identified as a loaded Smith and Wesson 38-caliber revolver.
After Mr. Herrington and the firearm were secured, Detective Perez conducted a computer search and learned that Mr. Herrington was not wanted, despite what the dispatcher had said. The computer search did show, however, that Mr. Herrington was a convicted felon, who was on probation for possession of heroin. Detective Perez then arrested Mr. Herrington for carrying a concealed firearm and for being a convicted felon in possession of a firearm. Detective Perez testified that even though the computer search showed that Mr. Herrington was a convicted felon, he already knew this. In fact, Detective Perez said that he had arrested Mr. Herrington on two previous occasions.
At the trial, Detective Perez identified the revolver that Mr. Herrington had in his possession. Detective Perez also identified four live 38-caliber bullets that were inside the gun at the time it was seized from Mr. Herrington.
Detective Perez further testified regarding the call that he received from the dispatcher prior to Mr. Herrington's arrest. He said that he did not talk to the person who called the 911 operator with the information regarding the two men who were wanted in connection with a shooting. The 911 operator had transferred the initial call to the dispatcher. The dispatcher then relayed the information from the call to Detective Perez.
NOPD Officer George Jackson also testified at the trial. It was stipulated that *1274 Officer Jackson was an expert in the field of the examination of latent fingerprints. He testified that the fingerprints he had taken from Mr. Herrington were the same as the fingerprints taken in connection with Mr. Herrington's prior arrest. Additionally, he testified that Mr. Herrington's fingerprints appeared on the reverse side of a bill of information that charged him with a felony narcotics violation.
Danielle Howard, the police complaint operator for the NOPD, was the third person to testify at Mr. Herrington's trial. She testified that her job was to take 911 calls and to process them for dispatch to the police officers. Ms. Howard identified an incident recall sheet for the incident involving two men, Wardell, Jr. and Wardell, Sr., allegedly wanted for a shooting. The 911 call was made anonymously.
Mr. Herrington was found guilty as charged by a jury. He was subsequently sentenced to serve ten years at hard labor without probation, parole, or suspension of his sentence. He was also fined, but the fine was suspended.

ERRORS PATENT
There are no errors patent.

DISCUSSION
Mr. Herrington has raised two assignments of error. They are discussed below.
Assignment of Error Number 1: An uncorroborated tip from a 911 caller stating that a person is wanted by the police cannot form the basis for reasonable suspicion for the police to conduct a stop of that person.
We must determine whether Detective Perez had a right to conduct an investigatory stop of Mr. Herrington based on the anonymous tip that was received by a 911 operator, transmitted to a police dispatcher, and ultimately given to Detective Perez. In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court first recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22, 88 S.Ct. at 1880. According to the Terry case, such an investigatory stop is not an unlawful "seizure" and, therefore, does not violate the prohibition against unreasonable searches and seizures established by the Fourth Amendment to the United States Constitution.
In Louisiana there is statutory authorization for investigatory stops on less than the probable cause required for an arrest. La. C.Cr.P. art. 215.1(A) provides that "[a] law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions."
In State v. Dank, 99-0390 (La.App. 4 Cir. 5/24/00), 764 So.2d 148, this Court explained the factors a reviewing court must consider in determining whether an investigatory stop was permissible. This Court stated:
"Reasonable suspicion" to stop is something less than the probable cause required for an arrest, and the reviewing court must look to the facts and circumstances of each case to determine whether the detaining officer had sufficient facts within his knowledge to justify an infringement of the suspect's rights. Evidence derived from an unreasonable stop, i.e., seizure, will be excluded from trial. In assessing the reasonableness of an investigatory stop. . . . [t]he totality of the circumstances must be considered in determining *1275 whether reasonable suspicion exists. The detaining officers must have knowledge of specific, articulable facts, which, if taken together with rational inferences from those facts, reasonably warrant the stop. In reviewing the totality of the circumstances, the officer's past experience, training and common sense may be considered. . . .
99-0390, pp. 4-5; 764 So.2d at 155 (citations omitted).
Both the United States Supreme Court and the Louisiana Supreme Court have considered whether an anonymous tip is a sufficient basis to justify an investigatory stop. Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000); State v. Robertson, 97-2960 (La.10/20/98), 721 So.2d 1268. In neither of these cases was an investigatory stop justified by an anonymous tip.
In the J.L. case an anonymous caller reported to the police department that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268, 120 S.Ct. at 1377. Two police officers were instructed to respond to the call. They arrived at the bus stop and saw three black males. One of the three men, J.L., was wearing a plaid shirt. The officers did not see J.L. carrying a firearm, and he made no threatening or unusual movements. One of the officers approached J.L. and frisked him. A gun was seized from J.L.'s pocket. The officers also frisked the other two men at the bus stop and found no weapons. J.L. was charged with carrying a concealed firearm without a license and with possessing a firearm while under the age of 18. The Supreme Court of Florida held that the search was invalid under the Fourth Amendment to the United States Constitution.
In J.L. the United States Supreme Court said that the police officers' suspicions regarding J.L. arose from a call made from an unknown location by an unknown caller and not from any independent suspicions of their own. The Supreme Court stated:
Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity."
529 U.S. at 270, 120 S.Ct. at 1378, quoting Alabama v. White, 496 U.S. 325, 329, 110 S.Ct. 2412, 2415, 110 L.Ed.2d 301, (citation omitted). The Supreme Court in J.L. distinguished the White case, because the anonymous tip in White not only described the suspect but also predicted that she would leave an apartment building at a specified time, would enter a particularly described car, and would drive to a named motel. The Supreme Court stated that once the police in White were able to observe that the informant had accurately predicted the suspect's future behavior, it became reasonable for the police to think that the tipster had inside knowledge about the suspect. Therefore, the police were entitled to rely on the tipster's assertion that the suspect was in possession of cocaine and could properly conduct an investigatory stop.
In J.L. the United States Supreme Court stated that the White case was a "borderline" case. 529 U.S. at 271, 120 S.Ct. at 1379. The Supreme Court found that the tip in J.L. "lacked the moderate indicia of reliability present in White and essential to the Court's decision in that case." Id. The Supreme Court in J.L. further stated:
The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or *1276 credibility. . . . All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.
Id. The Supreme Court concluded that "[i]f White was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line." Id. Therefore, in J.L. the Supreme Court held that the Supreme Court of Florida was correct in holding that there was no basis for the investigatory stop of J.L.
In the Robertson case the Louisiana Supreme Court was presented with a situation in which an NOPD officer received an anonymous telephone call from a hotline operated by the Bureau of Alcohol, Tobacco, and Firearms (the "ATF"). The caller informed the officer that a person named "Will," who drove a dark green Pontiac Grand Am with very darkly tinted windows, was involved in the sale of narcotics in the Magnolia Housing Development. Will was described as being a black male with a very dark complexion, who was short and appeared to be a juvenile. The caller also said that the car would be parked in a certain block when Will was not delivering narcotics.
The NOPD officer and an ATF agent went to the block where the car was said to be parked. While they were preparing to set up surveillance, they observed the vehicle leave the driveway where it was parked. They then followed the vehicle until the driver exited it. When the driver exited the vehicle, the NOPD officer and the ATF agent saw that he matched the description of "Will," and they approached him. When "Will" stated that his name was William Robertson, he was informed that he was under investigation for narcotics law violations. A canine unit was called to the scene, and when a dog detected the odor of narcotics emanating from the vehicle, the NOPD officer entered the vehicle and discovered a plastic bag filled with crack cocaine.
The issue in the Robertson case was whether the anonymous tip, as it was corroborated by the NOPD officer and the ATF agent, was sufficient to furnish a reasonable suspicion of criminal activity. The Louisiana Supreme Court stated:
In the instant case, it is true that the officers were able to corroborate certain aspects of the anonymous tip, including defendant's name, his physical description and the location of the described vehicle. The tip, however, contained no predictive information from which the officers could reasonably determine that the informant had "inside information" or a "special familiarity" with the defendant's affairs.
97-2960, p. 5, 721 So.2d at 1270. Therefore, the Supreme Court found that there were no reasonable grounds for the NOPD officer and the ATF agent to believe that the informant possessed reliable information about the alleged illegal activities. The Supreme Court held that there was no reasonable suspicion to detain Mr. Robertson.
In another case decided by the Louisiana Supreme Court, State v. Johnson, 01-2436 (La.App. 4 Cir. 1/25/02), 806 So.2d 647, the Supreme Court did find that an anonymous tip led to a lawful seizure of evidence. In Johnson, however, an investigatory stop was not made. Rather, based on an anonymous tip, police officers simply engaged a suspect in conversation without signaling him to stop and without asserting any authority over him. The suspect then panicked, and discarded a paper bag containing contraband. The Supreme Court held that the paper bag was *1277 lawfully seized after it was discarded by the suspect.
In addition to the United States Supreme Court and the Louisiana Supreme Court, this Court has also considered whether an anonymous tip can be a valid basis for an investigatory stop. In State v. Boson, 99-1984 (La.App. 4 Cir. 1/17/01), 778 So.2d 687, based on complaints of drug trafficking in the area, NOPD officers were instructed by their supervisor to conduct a narcotics investigation at the Friendly Inn on Chef Menteur Highway. The officers were told that two black males were distributing narcotics from the inn, and they were to look for a white Ford LTD at that location.
When the police officers arrived at the inn's parking lot, they saw two males entering a white Ford LTD. The officers approached the LTD, ordered the men to exit the car, and patted down the men to determine whether they were armed. During the pat down of one of the men, one of the officers felt a bulge and saw some money in the man's pocket. One of the officers knew from experience that drugs are sometimes stored within paper currency. The man was ordered to empty his pockets, and when he placed a roll of money from his pocket on top of the police vehicle, it began to blow away. While the money was blowing away, the man tried to discard a plastic bag containing crack cocaine, which was seized.
This Court in Boson found that the officers were provided with little information from the supervisor who told them to go to the Friendly Inn. There was no testimony regarding the source of the information upon which the supervisor instructed the officers to go to the inn and look for a white Ford LTD. Therefore, this Court assumed that the informant was unknown and untested. When the officers arrived at the inn and spotted two black men with a white Ford LTD, there was no suspicious activity occurring. Based on those facts, this Court determined that the officers did not have a reasonable suspicion to stop the two men. Thus, the evidence seized was required to be suppressed.
In State v. Jones, 02-1168 (La.App. 4 Cir. 1/29/03), 839 So.2d 377, this Court again considered whether, based on an anonymous tip, there was reasonable suspicion to conduct an investigatory stop. A police officer testified that he responded to a dispatch call stating that a black male wearing a yellow shirt and blue shorts, who was in the 3000 block of Mandeville Street, had a gun in his possession. When he arrived on the scene, the officer observed several people on the side of the street, and he saw a man wearing a yellow shirt and blue shorts. When the officer exited his vehicle and began to approach the man, the man began to walk away while appearing to be nervous and confused. The officer asked the man to stop, but the man walked away faster. When the officer caught up with the man, the officer asked the man to place his hands on a wall so that a pat down for weapons could be conducted for the officer's safety. During the search, a loaded handgun was found and seized.
This Court determined that the officer had a sufficient basis upon which to conduct an investigatory stop and to frisk the man. This Court reasoned that when coupled with the anonymous tip, the fact that the man appeared nervous and confused and walked away, walking even faster when the officer spoke to him, created the reasonable suspicion needed for an investigatory stop.
In the instant case an anonymous tip was relayed to Detective Perez. The tipster gave the names of two men, described what they were wearing, said that they were walking together, and asserted that *1278 the two men were wanted in a shooting. The only reliable information that was given by the tipster was Mr. Herrington's name and a description of the clothes he was wearing. Although Mr. Herrington was walking near the location where he was said to be walking, he was alone, and he was not walking with another person as the tipster had said he was. Additionally, there was no predictive information given about Mr. Herrington's future actions, and the information that Mr. Herrington and the person with whom he was supposed to be walking were wanted in connection with a shooting was false. Further, Mr. Herrington did not appear nervous when Detective Perez confronted him, and he fully cooperated with the police. No surveillance was conducted, and there was no corroboration of the information given by the tipster.
Based on these facts and circumstances, we find that the investigatory stop of Mr. Herrington was not justified. Therefore, the weapon that Mr. Herrington was carrying was illegally seized. The trial court erred in failing to grant Mr. Herrington's motion to suppress the evidence. This assignment of error has merit.
Assignment of Error Number Two: If this Court cannot reverse on the merits the district court's ruling denying the motion to suppress, it must vacate that ruling in light of the unavailability of a hearing transcript.
We have determined that Mr. Herrington's conviction should be reversed. Therefore, we need not address this assignment of error.

DECREE
Mr. Herrington's conviction is hereby reversed. This matter is remanded to the trial court for further proceedings consistent with this opinion.
CONVICTION REVERSED AND REMANDED.
NOTES
[1] La. R.S. 14:95.1(A) reads in relevant part:

A. It is unlawful for any person who has been convicted of . . . any violation of the Uniform Controlled Dangerous Substances Law which is a felony . . . to possess a firearm or carry a concealed weapon.
[2] Mr. Herrington was tried and convicted a week before Hurricane Katrina, which accounts for the length of time between his trial and his sentencing.